# Exhibit 1

# CHANCERY COURT SUMMONS
## MONTGOMERY COUNTY, TENNESSEE

CHANCELLOR BEN DEAN

CAITLIN REANN WYATT

VS.

CLARKSVILLE HEALTH SYSTEM, G.P.

A TRUE COPY ATTEST
FILED 3-20 2024
HEATHER L. MOORE, C&M

CASE NO. MC-CH-CV-MG-24-7

**METHOD OF SERVICE:**
- [ ] MONTGOMERY CO. SHERIFF
- [ ] SECRETARY OF STATE
- [ ] CERTIFIED MAIL
- [ ] COMM. OF INSURANCE
- [x] PRIVATE PROCESS
- [ ] OUT OF COUNTY SHERIFF
- [ ] OTHER (SPECIFY)

SUMMONS TO: Clarksville Health System, G.P.

c/o Russell Baldwin

4000 Meridian Blvd., Franklin, TN 37067

You are summoned to appear and defend a civil action filed against you which has been filed in Chancery Court, Montgomery County, Tennessee, and your defense must be made within thirty (30) days from the date this summons is served upon you. You are further directed to file your defense with the Clerk of the Court and send a copy to the Plaintiff's attorney at the address listed below. In case of your failure to defend this action by the above date, judgment by default may be rendered against you for the relief demanded in the Complaint.

Issued: 3-20-24

ATTORNEY NAME & ADDRESS: Jesse Ford Harbison
P.O. Box 68251
Nashville, TN 37206

HEATHER L. MOORE
Clerk and Master, Chancery Court,
Montgomery County, Tennessee

By _____
Deputy Clerk and Master

---

### RETURN ON PERSONAL SERVICE OF SUMMONS

- [ ] Executed by reading the summons and leaving a copy of the Complaint with _____

- [ ] I was unable to execute this summons and a copy of the Complaint because _____

On this the ____ day of _____, 20____

_____
Sheriff / Process Server

---

### RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify that on _____ 20____, I sent, postage prepaid, by registered return receipt or certified return receipt mail, a certified copy of the summons and a copy of the Complaint in case # MC-CH-CV-____-____-____ to the Defendant, _____. On _____, 20____ I received the return receipt, which had been signed by _____ on _____, 20____. The return receipt is attached to this original summons to be filed by the Chancery Court Clerk & Master.

_____
Person authorized by statute to serve process

---

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) debtor's equity interest personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in the action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the Clerk of Court. This list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be included, these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized, you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Mail list to: Clerk and Master, Montgomery Co. Court Center, Two Millennium Plaza, Ste 101, Clarksville, TN 37040.

---

### CERTIFICATION (IF APPLICABLE)

I, HEATHER L. MOORE, Clerk & Master of the Chancery Court for Montgomery County, Tennessee, do certify this to be a true and correct copy of the original Summons issued in this case.

_____          _____
Date                    Deputy Clerk & Master

**ADA – FOR ASSISTANCE CALL (931) 920-1844**

RECEIVED
MAR 22 2024

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE,
NINETEENTH JUDICIAL DISTRICT AT MONTGOMERY COUNTY

| | |
|---|---|
| CAITLIN REANN WYATT, | ) |
|     *Plaintiff,* | ) ) ) |
| v. | ) Case No. _____ ) |
| CLARKSVILLE HEALTH SYSTEM, G.P. d/b/a TENNOVA HEALTHCARE— CLARKSVILLE, | ) JURY DEMANDED ) ) ) ) |
|     *Defendant.* | ) |

## COMPLAINT

Plaintiff Caitlin ReAnn Wyatt ("Plaintiff" or "Ms. Wyatt") alleges the following claims against Defendant Clarksville Health System, G.P. d/b/a Tennova Healthcare—Clarksville ("Defendant"):

### INTRODUCTION

1. This is an action for unlawful employment practices under the Tennessee Public Protection Act ("TPPA"), Tennessee Code Annotated section 50-1-304, Tennessee common law, and the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, *et seq.*

2. Specifically, Plaintiff worked as a Registered Nurse in Defendant's Emergency Room. While working in the ER, Plaintiff witnessed unsafe and unsanitary conditions that affected patient and worker safety.

3. Plaintiff accurately and objectively charted factual events in patients' charts, as required by law and the ethics of Plaintiff's profession. Beginning in the summer of 2023, Plaintiff

RECEIVED

MAR 2 2 2024

BY: *Litigation*

was instructed to omit factual events from patients' charts because those facts placed Defendant's ER in an unflattering light and would "hand a lawyer a case on a silver platter."

4. Plaintiff refused to remain silent about and/or participate in Defendant's unlawful and unethical directives regarding patients' charts; as a result, Defendant terminated Plaintiff.

## PARTIES, JURISDICTION, AND VENUE

5. Plaintiff is a citizen of the state of Tennessee and resides in Montgomery County, Tennessee.

6. Defendant Clarksville Health System, G.P. is a general partnership doing business as Tennova Healthcare—Clarksville.

7. This Court has jurisdiction over the subject matter of this action pursuant to Tennessee Code Annotated section 16-11-101 and 4-21-311(a).

8. Venue is proper in this Court pursuant to Tennessee Code Annotated section 20-4-101 because the causes of action alleged in this Complaint arose in Montgomery County, Tennessee.

## STATEMENT OF FACTS

9. Defendant operates a general acute care hospital (including an emergency room) in Clarksville, Tennessee.

10. Plaintiff has been a registered nurse (an "RN") since 2021.

11. At the time of her unlawful termination, Plaintiff worked in Defendant's ER as an RN and a charge nurse.

12. During Plaintiff's employment with Defendant, Defendant's ER was both understaffed and lacked enough beds for the volume of patients treated in Defendant's ER.

13. Defendant knew about the bed shortage in its ER going back to at least 2021. In an application for a Certificate of Need completed by Defendant and submitted to the State of Tennessee in 2021, it stated its ER is "extremely busy and crowded" and "experience[s] a number of visits per bed in excess of recommended standards."

14. During the COVID-19 pandemic, Defendant increased the pay rates of its emergency room employees to incentivize them to continue their employment.

15. Despite the ongoing staffing and bed shortages in its ER, on or around January 30, 2023, Defendant's Director of Emergency Services, Jackie DeBeche ("Ms. DeBeche") sent an email to Defendant's emergency department staff stating that effective February 1, 2023 (*i.e.*, forty-eight hours later), "there will be changes in the pay rates being offered." Specifically, nurse and paramedic pay would be reduced from $75.00 an hour to $60.00 an hour; licensed practice nurse pay would be reduced from $50.00 an hour to $40.00 an hour; and ER technician pay would be reduced from $25.00 per hour to $20.00 per hour. Along with these pay cuts, Defendant also cut the number of hours for many of its emergency department staff.

16. As a result of these abruptly-announced pay cuts, Defendant's staffing shortage in its emergency department worsened.

17. Several months later, Defendant abruptly announced even further pay cuts for its emergency department employees; at the same time, Defendant terminated the contracts of many of the travel nurses working in its ER.

18. As a result of Defendant's actions, the ER—which already had insufficient staff prior to the pay cuts and the termination of the travel nurse's contracts—had a severe staffing shortage.

3

19.     The ER staffing shortage affected patient and worker safety. For example, Defendant failed to ensure it had sufficient staff to perform sanitation and housekeeping duties. This was in contravention of the Rules of the Tennessee Health Facilities Commission, Chapter 0720-14-.06, which requires hospitals to "assur[e] the clean and sanitary condition of the hospital to provide a safe and hygienic environment for patients and staff." Because of the lack of housekeeping staff, ER nurses had to clean up patient fluids, and there were frequently fluids (such as blood) on the floor or railing of ER rooms and ER stretchers because of Defendant's failure to provide sufficient staff to assure the clean and sanitary condition of the ER.

20.     Furthermore, sharps containers were not emptied regularly, which resulted in the sharps containers overflowing with contaminated sharps, posing a risk to both patients and employees. Defendant's failure to provide sufficient staff to ensure the appropriate storage and disposal of contaminated sharps was also in contravention of the Rules of the Tennessee Health Facilities Commission, Chapter 0720-14-.10.

21.     The staffing shortage, combined with the bed shortage in Defendant's ER, affected patient care. Defendant placed ER patients on stretchers in the hallways of the ER, instead of in rooms with proper monitoring equipment. As a result of the bed and staffing shortages in the ER, Defendant delayed in admitting patients with life-threatening illnesses. Instead, patients were held in triage rooms in the ER for extended periods of time and were not provided appropriate medical screening examinations and/or necessary stabilizing treatment, as required by the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd.

22.     Despite the staffing shortages in Defendant's ER, Plaintiff performed her duties as a Registered Nurse excellently. As a result, in or around June 2023, Defendant promoted Plaintiff to charge nurse position.

4

23. In July 2023, Plaintiff's complained to her supervisor, emergency department interim director Megan Keyt ("Ms. Keyt"), regarding the unsafe conditions in the ER. Plaintiff's complaints were in accordance with Defendant's policies to report safety issues through the hospital's chain of command. Upon information and belief, Ms. Keyt took no action in response to Plaintiff's complaint.

24. During Plaintiff's employment, she accurately and objectively documented information in patients' charts in accordance with the laws and regulations governing medical records, as well as the generally-accepted industry standards for registered nurses.

25. Furthermore, under the Tennessee Health Care Liability Act, "[a]ny person . . . asserting a potential claim for health care liability shall give written notice of the potential claim to each health care provider that will be a named defendant at least sixty (6) days before the filing of a complaint based upon health care liability in any court of this state," and the notice must include a "HIPAA complaint medical authorization permitting the provider receiving the notice to obtain complete medical records from each other provider being sent a notice." Tenn. Code Ann. §§ 29-26-121(a)(1), (a)(2)(E).

26. According to the Tennessee Supreme Court, the "purpose of Tenn. Code Ann. § 29-26-121(a)(2)(E) is not to provide defendants with notice of a potential claim. Instead, Tenn. Code. Ann. § 29-26-121(a)(2)(E) serves to equip defendants with the actual means to evaluate the substantive merits of a plaintiff's claim *by enabling early access to a plaintiff's medical records.*" *Stevens ex rel. Stevens. v. Hickman Comm. Health Care Servs.*, 418 S.W.3d 547, 555 (Tenn. 2013) (emphasis added).

27. As a result, inaccurate or incomplete documentation of information in patients' charts contravenes the public policy enumerated in the Tennessee Health Care Liability Act,

5

because inaccurate and/or incomplete records could result in a defendant in a healthcare liability case being unable to properly evaluate the substantive merits of a plaintiff's claim.

28.  Because of the dire conditions in the ER described above, after Plaintiff became a charge nurse, she began instructing the other nurses to document anytime they informed their chain of command of an issue affecting and/or related to a patient's care in the patient's chart.

29.  Shortly after Plaintiff's initial complaint to Ms. Keyt, a patient (hereafter "John Doe") died of cardiac arrest in the triage area of the ER. At the time of his death, there was a lack of open beds and proper monitoring.

30.  Plaintiff accurately and objectively documented in Mr. Doe's chart that a triage nurse recommended that Mr. Doe should be placed in an ER room out of the triage area for proper treatment, but there were not enough beds available to do so.

31.  Shortly thereafter, Ms. Keyt called Plaintiff into her office and showed Plaintiff Mr. Doe's chart. Ms. Keyt told Plaintiff not to put any information about bed shortages in patients' charts because it "gives a lawyer a case on a silver platter."

32.  Ms. Keyt's directive to omit pertinent, factual information was unlawful and unethical, and Plaintiff refused to participate in it. She continued to accurately document relevant information in patients' charts.

33.  Approximately one week later, another patient in the ER (hereafter, "Jane Roe") was exhibiting signs of sepsis. As a result, Ms. Roe needed to be treated with either a central venous catheter (a "central line") or a peripherally inserted central catheter (a "PICC line").

34.  It was not within the scope of practice for any of the nurses on staff to insert the type of central line that Ms. Roe needed. Inserting this type of central line was only within the

6

scope of practice of a medical doctor. Additionally, inserting the PICC line was only within the scope of practice of certain specially-trained nurses, referred to by Defendant as "PICC Nurses."

35. Plaintiff informed the medical doctor on-staff that Ms. Roe needed a central line or PICC placement due to multiple failed attempts of peripheral IV access. The doctor told Plaintiff, "well, I can't do that because I don't have the resources for that. Check with the PICC Nurse." Ms. Roe then called the PICC Nurse, who did not answer Plaintiff's call.

36. After the PICC Nurse did not answer Plaintiff's call, Plaintiff called Defendant's House Supervisor, who told Plaintiff there was not a PICC Nurse on staff. Plaintiff then told the doctor there was no PICC Nurse on staff that day.

37. Ms. Roe died while in Defendant's care.

38. Plaintiff accurately and objectively documented in Ms. Roe's chart that the doctor was notified that the patient needed a central line, that the doctor said he could not insert the central line because of a lack of resources, that she called the PICC Nurse, and that she notified the doctor that a PICC Nurse was not on staff that day.

39. On or around August 13, 2023, Defendant held two staff meetings with its ER nurses—one in the morning, and one in the afternoon.

40. At both meetings, a quality assurance representative spoke to the nurses regarding the ER nurses' charting practices. Upon information and belief, the quality assurance representative was not directly employed by Tennova Healthcare—Clarksville.

41. Upon information and belief, at the morning meeting, the quality assurance representative read Plaintiff's entry in Mr. Doe's chart aloud as an example of the type of information that Defendant wanted nurses to omit from patients' charts.

42. Plaintiff attended the afternoon nurse's meeting with the quality assurance representative. At that meeting, the quality assurance representative read Plaintiff's entry in Ms. Roe's chart described above as an example of the type of information that Defendant wanted its nurses to omit from patients' chart.

43. At the meeting, Plaintiff refused to remain silent about Defendant's unlawful and unethical directive to omit information from patients' charts. Plaintiff asked why nurses should exclude factual information from a patient's chart if the information was directly related to the patient's care.

44. The quality assurance representative stated that including such information made Defendant look "unprofessional," that it was akin to "airing dirty laundry," and that an attorney could use the information in the chart to the attorney's advantage.

45. After this meeting, Ms. Keyt continued to tell Plaintiff to omit pertinent and accurate factual information from patients' charts, including information about reporting issues affecting patient care to her chain of command.

46. Throughout the remainder of her employment, Plaintiff continued to refuse to engage in the unlawful charting practices, and continued to accurately and factually chart information in patients' charts.

47. Approximately one month later, Plaintiff was called into a meeting with Ms. Keyt and Defendant's HR Director. At the meeting, the HR Director told Plaintiff she was terminated due to the safety and charting concerns she brought up at the August 13, 2023 meeting. Defendant told Plaintiff to gather her things and leave the facility.

48. As Plaintiff was leaving Defendant's facility, a fellow nurse asked Plaintiff if she had been terminated. Plaintiff told the nurse that Defendant terminated her for bringing up the

safety and charting concerns at that August 13, 2023 meeting. One of Defendant's HR representatives then told Plaintiff not to discuss the circumstances of her termination with any of her coworkers and to leave the building.

## COUNT ONE: RETALIATION IN VIOLATION OF THE TENNESSEE PUBLIC PROTECTION ACT, TENN. CODE ANN. § 50-1-304

49. Plaintiff incorporates Paragraphs 1 through 48 above as if each has been fully restated herein.

50. Plaintiff was Defendant's "employee" under the TPPA.

51. Defendant is an "employer" under the TPPA.

52. As set forth above, Plaintiff refused to participate in, or remain silent about, illegal activities while employed by Defendant.

53. After engaging in protected activity under the TPPA, Defendant terminated Plaintiff.

54. Defendant terminated Plaintiff because she engaged in protected activity under the TPPA.

55. As a result of these acts, Defendant violated the Tennessee Public Protection Act, Tennessee Code Annotated section 50-1-304.

56. As a result of Defendant's violation of the TPPA, Plaintiff is entitled to compensatory damages in an amount to be determined at trial, back pay, interest on back pay, other equitable relief, and reasonable costs and attorney's fees.

## COUNT TWO: RETALIATION IN VIOLATION OF THE EMERGENCY MEDICAL TREATMENT AND ACTIVE LABOR ACT, 42 U.S.C. § 1395dd

57. Plaintiff incorporates Paragraphs 1 through 56 above as if each has been fully restated herein.

9

58. The Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, requires Defendant to provide appropriate medical screening examinations and/or necessary stabilizing treatment.

59. Defendant penalized and took adverse action against Plaintiff because she complained about the unsafe conditions in the ER (including the staffing and bed shortages), which resulted in Defendant's failure to provide appropriate medical screening examinations and/or necessary stabilizing treatment.

60. As a result of these acts and omissions, Defendant violated the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd.

61. As a result of Defendant's violation of EMTALA, Plaintiff is entitled to compensatory damages in an amount to be determined at trial, back pay, interest on back pay, other equitable relief, and reasonable costs and attorney's fees.

## RELIEF REQUESTED

WHEREFORE, Plaintiff prays for the following relief:

1. A jury to try her claims.

2. Entry of judgment in favor of Plaintiff, and against Defendant, for compensatory damages in an amount to be proven at trial.

3. Entry of judgment in favor of Plaintiff, and against Defendant, for punitive damages in an amount to be proven at trial.

4. Entry of judgment in favor of Plaintiff for back pay, front pay, and other equitable relief.

5. An award of Plaintiff's costs, reasonable attorney's fees, and pre- and post-judgment interest.

6. Any other legal or equitable relief to which Plaintiff may be entitled.

7. Plaintiff seeks damages of a fair and reasonable amount to be determined by a jury in an amount not to exceed $7,500,000.00.

Dated: March 19, 2024

Respectfully submitted,

**JESSE HARBISON LAW PLLC**

/s/ *Jesse Ford Harbison*

Jesse Ford Harbison, BPR No. 032105
P.O. Box 68251
Nashville, Tennessee 37206
(629) 201-7284
jesse@jesseharbisonlaw.com

**STEINER & STEINER, LLC**

/s/ *Ann Buntin Steiner by JFH w/ permission*

Ann Buntin Steiner, BPR No. 11697
613 Woodland Street
Nashville, TN 37206
(615) 244-5063
asteiner@steinerandsteiner.com

*Counsel for Plaintiff Caitlin ReAnn Wyatt*

11